UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MATTHEW MORRIS,

      Plaintiff,

v.

PAYCOM PAYROLL, LLC,
BRENDAN P. NUESSLE, and
AMY MINOTTI

      Defendant.

Case No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff Matthew Morris ("**Plaintiff**" or "**Mr. Morris**") by his undersigned counsel, Derek Smith Law Group, PLLC, hereby complains of Defendant Paycom Payroll, LLC ("**Defendant Paycom**" or the "**Company**"), Brendan P. Nuessle ("**Defendant Nuessle**"), Amy Minotti ("**Defendant Minotti**") and alleges as follows:

## INTRODUCTION

1. This case is about a family man whose employer terminated him 5 days after he requested paternity leave.

2. Plaintiff Matthew Morris brings this action pursuant to the Family and Medical Leave Act 29 U.S.C. § 825.220 ("**FMLA**"). Mr. Morris seeks monetary relief to redress Defendant's unlawful employment practices in violation of the FMLA.

3. In short, this is a simple FMLA action. Defendants interfered with Plaintiff's FMLA rights immediately after he inquired about paternity leave, and then retaliated against him by terminating Mr. Morris because he requested FMLA leave.

1

4. Mr. Morris, a salesman, requested paternity leave to care for his pregnant wife and newborn child as Plaintiff's family was set to welcome its second child, their first being two years old.  However, Defendants made clear Paycom was not the family-oriented corporation it purported to be.  Indeed, Defendants began retaliating and interfering with Plaintiff's FMLA rights immediately after Mr. Morris inquired about paternity leave..

5. Defendant Nuessle, placed Mr. Morris on a "final warning" two days after he requested paternity leave notwithstanding representations that Mr. Morris could depend on his job security.  The next day, Defendant Nuessle joked about "Matthew working at Starbucks."  Then, weeks later, at the behest of Defendant Minotti, Defendant Nuessle terminated Mr. Morris five days after he filed for FMLA leave.

6. Consequently, Mr. Morris was out of work, out of health insurance, and out of a vestment of Paycom Payroll stock he rightfully earned by selling more than a million dollars' worth of sales, outperforming thousands of Paycom employees.  Meanwhile, Mr. Morris and his family now faced the prospects of bringing a second child into the world with no dependable income.

7. At bottom, Defendants are liable for interfering with a plaintiff's FMLA rights and for terminating Mr. Morris because he filed for FMLA leave.

## JURISDICTION AND VENUE

8. The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1367 (supplemental jurisdiction).

9. Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b) because a substantial portion of the acts or omissions giving rise to this action occurred in the Southern District of Florida.

## PARTIES

10. Plaintiff Matthew Morris is an individual man and a citizen of Florida.

11. Plaintiff is expressly authorized to bring this action by FMLA.

12. Plaintiff is an "eligible employee" pursuant to 29 CFR § 825.110(a)(1) because Mr. Morris was employed by Defendant Paycom Payroll, LLC for more than 12 months, and Plaintiff was employed for at least 1,250 hours of service during the 12-month period immediately preceding exercising his FMLA rights.

13. Defendant Paycom Payroll, LLC is a foreign limited liability company, registered under the laws of Delaware, with its principal place of business located at 7501 W Memorial Rd., Oklahoma City, Oklahoma 73142, and a location at 1223 Brickell Ave, Suite 800, Miami Florida 33131 (the "**Miami Office**").

14. Defendant Paycom is a "covered employer" within the meaning of the FMLA, because, pursuant to 29 C.F.R. § 825.104(a), Paycom Payroll, LLC employs more than 50 employees throughout the current and preceding calendar year.

15. Defendant Brendan Nuessle is an individual man and is believed to be a citizen of Florida.

16. Defendant Nuessle is Paycom's "Miami Sales Manager" and Plaintiff's immediate supervisor.  Mr. Nuessle held direct supervisory authority over Plaintiff, controlling various terms and conditions of his employment.

17. Defendant Nuessle is a "covered employer" within the meaning of the FMLA because, pursuant to 29 U.S.C. § 2611(4)(A)(ii)(I), Defendant Nuessle is a "person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."

18. Defendant Amy Minotti is an individual woman and is believed to be a citizen of Georgia.

19. Defendant Minotti is the "Southeast VP of Sales at Paycom Software." Defendant Minotti held direct supervisory authority over Plaintiff, controlling various terms and conditions of his employment.

20. Defendant Minotti worked in tandem with Defendant Nuessle, overseeing the activities of the Miami Office, including ultimate employee decisions, including authorizing Paycom to terminate Mr. Morris after he filed for FMLA leave.

21. Defendant Minotti is a "covered employer" within the meaning of the FMLA because, pursuant to 29 U.S.C. § 2611(4)(A)(ii)(I), Defendant Minotti is a "person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer."

## FACTUAL ALLEGATIONS

22. Plaintiff Matthew Morris is a thirty-three-year-old man.

23. Mr. Morris is married and the father of a toddler and an infant.

24. On or about November 4, 2014, Defendant Paycom hired Mr. Morris as an "Executive Sales Representative." Plaintiff sold Paycom's payroll services to clients including casinos, restaurants, and major shopping centers.

25. Mr. Morris has a demonstrated history of successful sales figures, and managerial promotions. For instance, in or around 2017, Mr. Morris earned the "Bronze Eagle Award," a Paycom reward reserved for only its top performing salespeople. Mr. Morris finished top ten in the Company, performing at 240% of his sales plan, selling over a million dollars in revenue.

26. In exchange for Plaintiff's performance, Paycom provided Mr. Morris with a stock divestment of 909 Paycom Payroll shares ("**PAYC**") over a three-year vest, beginning in April of

2019 to April of 2021. Specifically, Paycom promised to pay Plaintiff a 303-share vest of PAYC on April 23, 2019, April 23, 2020, and finally, on April 23, 2021.

27. However, Paycom did not provide Plaintiff with his last vestment. Instead, Paycom terminated Mr. Morris on or about March 23, 2021, five days after he filed his FMLA paperwork, and a month to the day of his final PAYC vestment.

28. In or around 2019, Mr. Morris transferred to Paycom's Miami Office, where Mr. Morris worked on a team of about 12 executive sales representatives. During Plaintiff's first year in Miami, Mr. Morris once again performed at 240% of his overall plan. Then in 2020, amid the bleak COVID-19 economic outlook, Plaintiff performed to 93% of his overall plan, during a year Paycom was seeing low numbers across the board.[1]

29. Plaintiff was one of Defendant Paycom's most decorated salespeople. However, once Mr. Morris informed Defendants that his wife was expecting a second child, Plaintiff's sales numbers—and his employment and the last 303 shares of PAYC—fell by the wayside.

**Defendants Retaliate Against Plaintiff After He Inquires About Paternity Leave**

30. On or about February 8, 2021, Mr. Morris attended his weekly Monday meeting with Mr. Nuessle.

31. Around this time, like most salespeople with the Company, Mr. Morris was concerned about his sales figures in an unsure post-pandemic market. However, Mr. Nuessle reassured Mr. Morris he would be fine. Indeed, Mr. Nuessle said, "I know you're under stress, but if you're worried about your job, *you have nothing to worry about*." Mr. Nuessle said, "I'll be transparent with you—*you are safe*."

---

[1] Paycom Payroll LCC provides payroll services for businesses. As such, their business model depends on the economy and, particularly, the country's employment rate.

5

32. Mr. Morris had a great working relationship with Mr. Nuessle during Plaintiff's first years in Miami. The two got along well and Mr. Morris enjoyed reporting to Mr. Nuessle. However, things immediately changed after Mr. Morris inquired about paternity leave.

33. On or about February 9, 2021, Mr. Morris filed an inquiry with Defendants' H.R. regarding the Company's paternity process.

34. On or about February 10, 2021, Taylor Mcmullen ("**Ms. Mcmullen**"), Paycom's then "HR Benefits-Leave Analyst," told Mr. Morris that "Paycom offers paid family leave."

35. On that same day, following Mr. Morris' effort to secure paid leave, after business hours, Mr. Nuessle initiated a series of retaliatory events against Plaintiff. Mr. Nuessle contacted Plaintiff and demanded Mr. Morris to create a "vidyard"—a short video Paycom employees sent to prospective clients.

36. Mr. Morris knew the importance vidyards had to his sales numbers, so he wanted his next one to be perfect. Mr. Morris told Mr. Nuessle he was getting a haircut in the morning, and said it would be best if he waited because he wanted to look his best for new potential customers. However, Mr. Nuessle insisted. Mr. Morris, unclear of where Mr. Nuessle was coming from, asked Mr. Nuessle if anyone else was making a vidyard. "No," Mr. Nuessle said, "but *you are*."

37. Mr. Nuessle insisted that Mr. Morris send Mr. Nuessle and Ms. Minotti Plaintiff's vidyard.

38. On or about February 11, 2021, Plaintiff and Mr. Nuessle met to discuss strategies for obtaining new clients. Mr. Morris said, "I could mention about me becoming a dad." Mr. Nuessle did not take too kindly to such suggestion.

39. On or about February 12, 2021, after conferring with Ms. Minotti, Mr. Nuessle reprimanded Mr. Morris, providing him with a "final write up."

40. To be sure, this was Plaintiff's first disciplinary action in the last two of his nearly seven years of employment.

41. Later that week, during a team meeting, Mr. Nuessle said, "Maybe Matthew will work at Starbucks."

42. Mr. Morris was humiliated by Mr. Nuessle's comments, and disgusted that he would even make such a remark. Plaintiff did not understand why, all of a sudden, Mr. Nuessle had a vendetta for Mr. Morris the days after he inquired about paternity leave.

**Defendants Terminate Plaintiff Days After He Files FMLA Paperwork**

43. In or around early March of 2021, Mr. Morris began the official FMLA paperwork process with Paycom. Around this time, and despite Mr. Morris making his efforts known, the Company's H.R. notified Mr. Nuessle that Plaintiff intended to take paternity leave beginning on or about March 26, 2021.

44. On or about March 17, 2021, Mr. Morris submitted all the required documentation and certification to have his leave approved.

45. Around this time, Mr. Nuessle and Ms. Minotti discussed Plaintiff's future with the Company.

46. On or about March 23, 2021, the Company terminated Plaintiff.

47. Here Mr. Morris was, out of work after requesting FMLA leave. His insurance was set to expire on the last day of March, and his wife was weeks away from giving birth to their second child.

48. Moreover, Plaintiff's stock divestment of 303 shares was about to vest on or about April 23, 2021.[2] However, Defendant Paycom blocked Mr. Morris' right to those shares by wrongfully terminating him. In fact, Defendant Paycom terminated Mr. Morris one month to the day of his third and final divestment of shares.

49. At thirty-three, Mr. Morris was depending on those funds for his family's future. Indeed, Mr. Morris did not intend to sell his stock divestment right away, but instead planned to hold the shares for retirement. Hence, Defendants deprived Mr. Morris of his rightfully owned stock divestment by wrongfully terminating him.

50. The above are just some of the examples of the unlawful actions Defendants subjected Plaintiff to.

51. Defendants unlawfully terminated Plaintiff because he requested FMLA leave.

52. Defendants did not act in good faith and had no reasonable grounds for believing they did not violate the FMLA by terminating Plaintiff 5 days after he requested FMLA leave.

53. As a result of Defendants' unlawful conduct, Plaintiff has suffered damages, including but not limited to financial and economic damages, lost wages (back pay and front pay) and benefits, advancement opportunities with Defendants, and continues to suffer the same.

54. At bottom, Defendants are liable for terminating Plaintiff because he requested FMLA leave.

---

[2] "PAYC" was trading at approximately $399.59 on April 23, 2021. *See* https://in.finance.yahoo.com/quote/PAYC/history/

## CAUSES OF ACTION

### COUNT I
### FMLA, 29 U.S.C. § 2615(a)(1)
### Interference with Rights
### (Against all Defendants)

55. Plaintiff reincorporates the allegations in paragraphs 15-35.

56. The FMLA states, in pertinent part:

> Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
>
> *(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.* (emphasis added).

57. The FMLA prohibits an employer from discharging an individual for asserting his rights under the FMLA. 29 U.S.C. § 2615(a).

58. Furthermore, the FMLA states, "It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter." 29 U.S.C. § 2615(a)(1).

59. The FMLA defines an "employer" as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4(A)(ii)(I).

60. To establish a claim of FMLA interference, an employee must show: (1) he was eligible for the FMLA's protections; (2) the employer was covered by the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave his employer notice of his intention to take leave; and (5) the employer denied the employee's FMLA benefits to which the employee was entitled.

9

61. First, Plaintiff was an eligible employee under the FMLA. Plaintiff is an eligible employee under the FMLA because he worked for Defendant for more than 12 months, and Defendant employed Plaintiff for at least 1,250 hours of service during the 12-month period immediately preceding exercising his FMLA rights.

62. Second, Defendant Paycom is a covered employer by the FMLA because Paycom Payroll, LLC employed more than 50 employees throughout the current and preceding calendar years.

63. Similarly, Defendant Nuessle and Defendant Minotti are covered employers because both Defendant and Defendant Minotti acted in the interest of Defendant Paycom in deciding to terminate Plaintiff.[3] Moreover, Defendant Nuessle and Defendant Minotti had supervisory authority over Plaintiff, including the power to terminate Plaintiff, in addition to supervising and controlling Plaintiff's work schedules and his conditions of employment, his rate and method of pay, and exercised personal responsibility for making decisions that contributed to interfere with Plaintiff's FMLA rights.

64. Third, as an eligible employee, Plaintiff was entitled to leave under the FMLA to care for his newborn daughter.

65. Fourth, Plaintiff provided notice to Defendants regarding his intent to take FMLA leave. On or about February 10, 2021, Plaintiff inquired about FMLA leave with Defendant Paycom. On or about February 11, 2021, Plaintiff told Defendant Nuessle he was having a second child. On or about March 17, 2021, Plaintiff filed paperwork to take FMLA leave.

66. Finally, Defendants denied Plaintiff his FMLA leave to which he was entitled because Defendants terminated Plaintiff's employment.

---

[3] The FMLA defines an "employer" as "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4(A)(ii)(I).

67. As an actual and proximate result of Defendants' interference with Plaintiff's FMLA rights, Plaintiff has suffered damages.

## COUNT II
### FMLA, 29 U.S.C. § 2615(a)(2)
### Retaliation
### (Against all Defendants)

68. Plaintiff reincorporates the allegations in paragraphs 15-40.

69. The FMLA states, in pertinent part, that

> Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:
>
> *(B) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.* (emphasis added).

70. The FMLA prohibits an employer from discharging an individual for asserting his rights under the FMLA. 29 U.S.C. § 2615(a)(2).

71. Plaintiff is an eligible employee under the FMLA because he worked for Defendant for more than 12 months, and Defendant employed Plaintiff for at least 1,250 hours of service during the 12-month period immediately preceding exercising his FMLA rights.

72. Defendant Paycom is a covered employer by the FMLA because Paycom Payroll, LLC employed more than 50 employees throughout the current and preceding calendar years.

73. Defendant Nuessle and Defendant Minotti are covered employers because both Defendant and Defendant Minotti are persons who acted directly and/or indirectly in the interest of Defendant Paycom in deciding to terminate Plaintiff. *See* 29 U.S.C. § 2611(4(A)(ii)(I).

74. Moreover, Defendant Nuessle and Defendant Minotti had supervisory authority over Plaintiff, including the power to terminate Plaintiff, in addition to supervising and controlling Plaintiff's work schedules and his conditions of employment, his rate and method of pay, and

exercised personal responsibility for making decisions that contributed to interfere with Plaintiff's FMLA rights.

75. To allege retaliation under the FMLA, an employee must show: (1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action; and (3) the adverse action was causally related to the protected activity.

76. Plaintiff engaged in statutorily protected activity, among other ways, on or about February 9, 2021, when he inquired about Defendants' paternity leave program.

77. On or about February 10, 2021, Defendant Paycom Payroll, LLC initiated a series of retaliatory actions that would dissuade a reasonable person from asserting his rights under the FMLA.

78. That day, Defendant Nuessle asked Plaintiff to make a video of himself conducting a sales pitch. Plaintiff said he was tending to his family and he would need to shower and dress himself in a suit. Plaintiff asked if anyone else had to do this, and Mr. Nuessle said, "No, but you are." Defendant Nuessle told Plaintiff to send a video to Defendant Nuessle and Defendant Minotti.

79. On or about February 11, 2021, Plaintiff told Mr. Nuessle he could use his forthcoming fatherhood to incentivize clients.

80. On or about February 12, 2021, Defendant Nuessle, acting as an agent and supervisor of Defendant Paycom Payroll, LLC gave Plaintiff a "final write up." This does not comport with Defendant Nuessle's assurance on or about February 8, 2021—before Plaintiff inquired about paternity leave—that Plaintiff had "nothing to worry about."

81. Defendant Nuessle and Defendant Minotti conferred on behalf of Defendant Paycom prior to reprimanding Plaintiff.

82. On or about March 18, 2021, Plaintiff again engaged in statutorily protected activity by submitting the required FMLA paperwork to Defendant Paycom Payroll, LLC.

83. On or about March 23, 2021, Defendant Paycom Payroll, LLC terminated Plaintiff.

84. Defendant Nuessle and Defendant Minotti discussed terminating Plaintiff before terminating Plaintiff on behalf of Defendant Paycom.

85. On or about April 23, 2021, Plaintiff was set to receive a stock vestment of 303 shares of PAYC for his excellent sales performance in 2017. However, Defendant Paycom terminated Plaintiff because he filed his FMLA paperwork.

86. Hence, Plaintiff suffered multiple materially adverse actions.

87. Indeed, any reasonable employee in Plaintiff's position would be dissuaded from exercising his rights under the FMLA if he knew he would be terminated, he would lose his health insurance, and he would lose out on a stock divestment of 303-shares trading at about $400 a share.

88. Plaintiff's materially adverse actions are causally connected to Plaintiff's protected activity under the FMLA. Indeed, five (5) days after Plaintiff requested FMLA leave to care for his pregnant wife, Defendant terminated his employment

89. Thus, on temporal proximity alone, Plaintiff's materially adverse action is causally connected to his protected activity under the FMLA.

90. As a result of Defendant's unlawful retaliation in violation of 29 U.S.C. § 2615(a)(2), Plaintiff has suffered damages.

## COUNT III
### Breach of Good Faith and Fair Dealing
### (Against Defendant Paycom)

91. Plaintiff reincorporates the allegations contained in paragraphs 15-20.

92. A stock award agreement existed between Plaintiff and Defendant Paycom in exchange for Plaintiff's 2017 sales figures. In consideration for Plaintiff selling more than a million dollars in sales, achieving the "Bronze Eagle Award," Defendant Paycom promised to provide Plaintiff with 909 shares of PAYC stock, set to divest over three years.

93. In addition to the contract's express and/or implied terms, the agreement included an implied covenant of good faith and fair dealing, requiring Plaintiff and Defendant Paycom to act with fairness and in good faith to each other.

94. Moreover, the agreement included an implied covenant to refrain from hindering or impeding the other party in the performance of the contract and prohibiting the parties from taking any action engineered to prevent the other from enjoying the benefits of the contract.

95. However, Defendant Paycom prevented Plaintiff from enjoying his final vestment of 303 PAYC shares. Indeed, Defendant Paycom breached the agreement inter alia, by terminating Plaintiff as a pretext to cheat him out of the final vesting of 303 PAYC shares, which Plaintiff was entitled because of his performance in 2017. As a result, Plaintiff lost out of a stock vestment, which, at the time, was valued at $120,075.77, based on the trading price of $399.59.

96. As a result of Defendant Paycom's breach, Plaintiff has suffered damages as set forth above, including, without limitation, the value of the lost 303 PAYC, in an amount to be proven at trial.

## COUNT IV
## Unjust Enrichment
## (Against Defendant Paycom)

97. Plaintiff reincorporates the allegations contained in paragraphs 15-40.

98. To state a claim for unjust enrichment, a plaintiff must establish that (1) he conferred a benefit of the defendant, (2) the defendant has knowledge of the benefit, (3) the

defendant voluntarily accepted the benefit without payment, and (4) the circumstances that exist are such that it would be inequitable for the defendant to keep the benefit without any payment.

99. Plaintiff conferred a benefit on Defendant Paycom by selling more than one million dollars in sales for the calendar year of 2017.

100. Paycom had knowledge of the benefit conferred by Plaintiff because Plaintiff earned revenue for Defendant Paycom.

101. Defendant Paycom voluntarily accepted and retained the benefit conferred by Plaintiff without full payment to Plaintiff. Paycom further provided Plaintiff the "Bronze Eagle Award" in exchange for the benefit conferred to Paycom, yet failed to pay Plaintiff the 909 shares Paycom promised.

102. Plaintiff earning more than a million dollars in sales for Defendant Paycom. Defendant Paycom's failure to pay Plaintiff—terminating him in retaliation—specifically to avoid paying him the last vestment is inequitable.

103. Defendant Paycom awarded Plaintiff 909 PAYC because of his 2017 sales, not for any future work. Paycom already received the value from Plaintiff and agreed to give Plaintiff 909 PAYC as an equitable award. However, Paycom did not fulfill their agreement. Paycom only administered 606 PAYC to Plaintiff.

104. Defendant Paycom inequitably benefitted by withholding 303 PAYC sjares from Plaintiff that was set to vest on April 23, 2021.

105. The situation is not equitable unless Defendant Paycom provides Plaintiff with the remaining 303 agreed-upon PAYC shares.

106. Plaintiff continued to work for Paycom with the understanding that 909 PAYC would vest over three years. Plaintiff worked each day from April 23, 2020, through March 23,

2021, with the understanding that he would receive the last installment of 303 PAYC on April 23, 2021.

107.  Plaintiff will not equitably benefit from the value he conferred to Paycom until he is justly provided with the 303 PAYC he was awarded several years ago.

108.  Plaintiff has suffered damages as a result of Defendant Paycom's breach of the implied covenant of fair dealing.

## COUNT V
### Promissory Estoppel
### (Against Defendant Paycom)

109.  Plaintiff reincorporates the allegations in paragraphs 15-40.

110.  To state a claim for promissory estoppel, a plaintiff must demonstrate: (1) detrimental reliance on the part of the plaintiff as to the defendant's promise; (2) the defendant reasonably should have expected the promise to induce reliance in the form of action or forbearance by the plaintiff; and (3) injustice can only be avoided by enforcement of the promise.

111.  A clear promise was made by Defendant Paycom to Plaintiff in 2017.

112.  Defendant Paycom's promise was unambiguous: The Bronze Eagle Award to Plaintiff explicitly stated that he would receive 909 shares of PAYC 909.  Paycom's promise further stated that 303 PAYC would vest annually for three years.

113.  Plaintiff detrimentally relied on Paycom's promise.  Plaintiff is a 33-year-old man with a pregnant wife and a child at home.  Plaintiff relied on the income and/or the financial safeguard of his 606 vested shares of PAYC, and particularly, the final vesting of 303 shares to support his growing family.

114. Consequently, Plaintiff's position changed for the worse in relying on, and not receiving, Defendant Paycom's promise of the full 909 PAYC shares. Thus, Plaintiff detrimentally relied on Defendant Paycom.

115. Plaintiff's reliance on the promise made by Defendant Paycom was reasonable. Stock awards are a standard compensation transaction used by employers to entice a successful employee to continue performing at a high level for them instead of leaving for another company or performing at a lower level. Because this is a standard procedure used to retain employees Plaintiff reasonably relied on the offer by Defendant Paycom. The Bronze Eagle Award was not a random bonus, but rather an award that carried with it a date of payment and an understood method of calculation.

116. Plaintiff expressly stated that his wife was pregnant, and he would need to take a paternity leave under FMLA, unpaid leave. Plaintiff clearly relied on Defendant's promise to his detriment.

117. Injustice can be avoided only by the payment of Plaintiff's rightfully earned final vestment of 303 PAYC shares. Otherwise, Defendant PAYC will retain its reward of extraordinary revenue from Plaintiff's performance, earning an award with a specific prize of 303 shares of Paycom's stock.

118. As a result of Plaintiff's detrimental reliance on Paycom following his performance, Plaintiff has suffered damages.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff demands judgment against Defendant Paycom Payroll, LLC Defendant Brendan Nuessle, and Defendant Amy Minotti containing the following relief:

    A.    An order directing Defendants to place Plaintiff in the position he would have had but for Defendant's discriminatory, retaliatory and/or otherwise unlawful treatment of Plaintiff.

    B.    Pursuant to 29 U.S.C. § 2617(a)(1)(A)(i)(I), an award of damages equal to the amount of any wages, salary, employment benefits, or other compensation denied or lost to Plaintiff because of Defendant's FMLA violation.

    C.    Against Defendant Paycom, an award of damages in an amount to be determined at trial, plus prejudgment interest to compensate Plaintiff for his stock vest of 303 shares of Paycom Payroll, LLC ("PAYC").

    D.    Against Defendants, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii), an award of liquidated damages for intentionally terminating Plaintiff because he requested FMLA leave;

    E.    Against Defendants, Pursuant to 29 U.S.C. § 2617(a)(1)(A)(3), an award against of costs that Plaintiff has incurred in this Action, in addition to any judgment awarded to Plaintiff, reasonable attorney's fee, reasonable expert witness fees, and other costs of the action fees plus costs and interest to the fullest extent permitted by law; and

    F.    Such other and further relief the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a jury trial of all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated: July 1, 2021                              Respectfully submitted,

                                                      By: /s/ Caroline H. Miller
                                                      Caroline H. Miller, Esq.
                                                      FL Bar No. 1012331
                                                      **DEREK SMITH LAW GROUP, PLLC**
                                                      *Attorneys for Plaintiff Matthew Morris*
                                                      701 Brickell Ave., Suite 1310
                                                      Miami, Florida 33131
                                                      (305) 946-1884